**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 5:07-cr-00009-LSC-JEO |
| | ) | |
| BRIAN SCOTT CULVER | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

This matter is before the court on the various motions of the defendant.  Each will be addressed individually below.

## I.  PROCEDURAL BACKGROUND

The defendant was indicted on January 31, 2007, in a two count indictment.  It charged him with sexual exploitation of a child on two occasions between September 2002 and November 2003, in violation of 18 U.S.C. § 2251(a).  (Doc. 1).  On March 28, 2007, a superseding indictment was filed charging the defendant with six counts of sexual exploitation of a child during the same time period.  (Doc. 49).  The first count charged that the exploitation was depicted on an 8mm videotape.  The remaining counts allege that the defendant sexually exploited a child on five distinct occasions through the production of five individual Polaroid photographs.

The defendant has filed over twenty motions that will be addressed herein, including motions to compel disclosure of the medical records of the purported victim (hereinafter "the victim" or "K.W.") (doc. 10), for additional physical examinations and photographing of "K.W." and Sharon Culver (doc. 12), to suppress fingerprints "allegedly 'lifted' from the 8mm videotape cassette tape" (doc. 24), to suppress the "'original' 8mm videotape" which forms the basis of the first count of the indictment (doc. 25), to suppress the identification of the defendant from a "still

photograph fingerprint" (doc. 26), for a *Daubert* hearing concerning the recovery and analysis of "fingerprint" evidence recovered from a "still photograph" of an image on the 8mm videotape (doc. 27), to dismiss the indictment for a lack of venue (doc. 28), to "dismiss and/or join multiplicious counts" (doc. 40), to dismiss for a lack of jurisdiction or venue (doc. 54), and to dismiss joint or multiplicious counts of the superseding indictment (doc. 55).

The defendant has also filed motions in limine concerning evidence of the November 12, 2003, domestic violence "911" call (doc. 14), the purported "drugging, stunning, or 'knock[ing]-out' of any person" (doc. 15), drug and prescription medicine procured by the defendant over the internet or elsewhere (doc. 16), the "drugging" of other persons (doc. 17), the recovery of "adult materials" at the defendant's residence (doc. 18), police interviews of "K.W." and Sharon Culver (doc. 19), use of a "'stun gun' on the victim" or the defendant's providing the victim with prescription drugs (doc. 20), evidence concerning the "'relative position(s)' of the body of the alleged victim . . . during any incident made the basis of the indictment" (doc. 21), any evidence seized from the defendant's vehicle (doc. 22), the defendant's prior state convictions for "possession of obscene materials" (doc. 36), and the relevancy of certain evidence recovered during the investigation of this matter (doc. 66).

The United States has filed various responses to the defendant's motions, including its opposition to the jurisdictional challenge (doc. 44 & 62), its consolidated response to the defendant's discovery motions (doc. 45), its general responses to various motions (doc. 48, 64 & 65), its response to the motion for subpoenas (doc. 52), and its response to the multiplicity challenge (doc. 63).

An evidentiary hearing was conducted on the motions on March 29, 2007, and May 1,

2007.  Extensive testimony was adduced and arguments were permitted.  The parties were also

afforded an opportunity to supplement the record following the second hearing.

## II.  FACTUAL BACKGROUND

According to the indictment and the evidence adduced at the evidentiary hearing,[1] the

United States alleges that the defendant violated the law when he produced the 8mm video and

five Polaroid pictures of a female child involved in sexually explicit conduct.  The items are

alleged to have been produced between September 2002 and November 2003.  They were

discovered by Hoover Police Department ("HPD") Officers when they responded to a "911"

domestic disturbance call at the defendant's residence at about midnight.  (H. Tr. at 159).

Specifically, the officers later learned that they were responding to a call that a child victim had

been awakened by being jolted with a "stun gun" and that the defendant purportedly was in the

bed with her.  *Id*. at 200, 207, 254.

When confronted about the incident by the victim's mother as the defendant ran out of the

victim's room, the defendant left the house.  *Id*. at 255.  She also observed red marks in the area

where K.W. said that she felt the shock.  When officers arrived on the scene, they observed

petroleum jelly lubricant on the headboard of the child's bed.  *Id*. at 185.[2]  They also observed

red marks on her shoulder, demonstrating the physical abuse necessary for a domestic violence

---

[1]A transcript of the April 17, 2007, hearing has been produced.  (Doc. 61 (hereinafter "H. Tr.")).  The transcript from the May 1, 2007, hearing has not been produced at this juncture.  The court also has reviewed the transcript from the initial detention hearing in this case for clarity.  (Doc. 50 (hereinafter "Det. H. Tr.")).

[2]The testimony from the detention hearing in this case also indicated that she also found a "vaginal syringe" containing K-Y Jelly and a white pill in the bedroom.  The pill was determined to be Zolpidem, which is the common name for Ambien.  Ambien is a sleeping pill.  *Id*.  During cross-examination, the testifying officer stated that the pill that purportedly was in the syringe had been placed in a pill bottle with other pills.

arrest.[3]  *Id*. at 189, 192, 199, 254.

The search of the residence was conducted with the permission of the defendant's spouse (Sharon Culver).[4]  *Id*. at 160.  The defendant was not there at the time because he had left before the officers were able to respond to the call.  Culver believed that he had left to go to a lake house in Cullman, Alabama.  *Id*. at 173.  Officers recovered Polaroid photographs and a Polaroid camera from the residence.  Five of the Polaroid photographs comprise Counts Two through Six of the indictment.  Also recovered in the search was the 8mm videotape that is the basis of Count One of the indictment.  A "stun gun box" was also located in the house.[5]  *Id*. at 304.[6]

The defendant did return later while they were still there early that morning.  (H. Tr. at 161, 255).  He parked his vehicle on the street and talked with the officers.  *Id*. at 256.  The officers talked with him about the situation.  *Id*. at 162.  The defendant was arrested on domestic violence charges.  *Id*. at 162, 258.  His vehicle was inventoried following his arrest and taken to HPD when what appeared to be a large amount of money was located.[7]  *Id*. at 174-76, 197, 259, 280.  The inventory, which was completed at HPD by Evidence Technician Mark Tant, was necessitated because the vehicle was parked on a public street.[8]  *Id*.  Recovered from the vehicle

[3]See ALA. CODE §§ 13A-6-132 & 133.

[4]She is also K.W.'s mother.

[5]Testimony was offered at the detention hearing in this case that the victim's mother provided the box to officers at the scene.  (Det. H. Tr. at 35).

[6]According to the testimony at the detention hearing, the victim was examined following the incident.  Blood work was positive for the presence of diazepam (Valium).  The victim, however, has no recollection of the events of this night.  The victim has identified the Polaroid pictures as being depictions of herself.

[7]HPD Lieutenant Michael Graves testified that the defendant also consented to the search of the vehicle so they could locate a prescription bottle that purportedly would match pills the defendant had in his pocket when he was arrested.  *Id.* at 257, 269-70, 273-75.

[8]The defendant was in the street due to the number of police cars located in the front of his residence.  *Id.* at 171.

4

were Internet articles concerning Valium and Ambien.[9]  *Id*. at 289.  A stun gun and blanket also were recovered from the defendant's Jeep during a third search at the private storage yard, but the United States does not intend to offer those items at trial.  *Id*. at 149.

Besides searching the defendant's home and vehicle, officers obtained a search warrant for a lake house in Cullman County, Alabama, belonging to the defendant.  The search warrant authorized the seizure of a "stun gun, stethoscope, pornographic photos, and pornographic videos."  (Ex. 10 at p. 3).  The search resulted in the recovery of blue bed linens that matched those observed in the video and photographs, assorted pills in bottles, a "pack of [V]alium," a "pack of Alprezolam," "6 video tapes," one yellow paper with writing, one "Homestyle" Affairs Magazine, and one shaving bag with "numerous sex toys and sex items."  *Id*. at p. 5.

Technician Tant processed the 8mm tape that was taken from the Hoover residence for fingerprints.  He was able to locate one latent print.  He submitted it to Carol Walker at the Birmingham Police Department for analysis.  He also arranged for a local company (Holt Video) to make a copy of the 8mm tape in the same format so that it could be used by the defense in the state case.  After doing so, the original 8mm tape was mistakenly provided to the defense.  When the mistake was discovered, it was returned to the prosecution within a few days.

A VHS copy of the original 8mm tape was also made for further examination.  Detective Charles Darren McGarrity compared the VHS copy to the original 8mm tape and determined it was an accurate copy of the same.  When Sergeant Tom McDanal examined the VHS copy of the 8mm tape he observed female genitalia and a person's hand.  (H. Tr. at 224).  Because of the closeness of the photography, McDanal noticed that one finger on the hand was turned towards

---

[9]They were located in the passenger's side of the back seat.  *Id*. at 299.

the camera.  *Id*. at 225.  He believed that a fingerprint could be identified from the video.  *Id*.

Therefore, using a "Video Analyst" software package on the computer, he created an image of

the thumb print on a computer disk.  *Id*. at 226-27, 238, 250.[10]  Evidence technician Tant then

produced a photograph of the print and provided it to fingerprint expert Carol Walker, who

compared it to that of the defendant.  *Id*. at 242.  She determined that the thumb print belonged to

the defendant.  *Id*. at 106-07.  She did this by having Tant "flip" the print and reduce[11] the size of

the photographed print to the ususal size so she could better examine it.  *Id*. at 104-05, 108, 132.

Tant also processed the Polaroid prints that were recovered in the residence for

fingerprints.  The photographs were in a single envelope and included one depicting male

genitalia and five depicting female genitalia.  The print with the male genitalia included a latent

print that Walker ultimately identified as belonging to the defendant.

### III.  DISCUSSION

#### A.  Motion to Suppress

##### 1.  Vehicle Evidence

The defendant alleges in his first motion to suppress that the seizure of evidence from his

vehicle was in violation of the Fourth Amendment.  (Doc. 22).  Related allegations and

challenges are advanced in the defendant's motion in limine regarding the Jeep evidence.  (Doc.

58).  The United States responds that the seizure of the evidence was a result of an inventory of

the vehicle, consent of the defendant, and plain view.[12]

---

[10]Sergeant McDanal's detailed description of how the photograph of the thumb print was made is located at pages 228-34 in the transcript.  (H. Tr. at 228-34).

[11]She had him reduce it to the actual size (1:1 ration).  *Id*. at 106, 108.

[12]At the hearing, the United States abandoned its consent theory.  (H. Tr. at 152).

The evidence seized from the defendant's Jeep includes a "stun gun," a purchase receipt for the "stun gun," and Internet articles or printouts concerning prescription medications.  (Doc. 66 at ¶ 1).  The prosecution informed the court at the evidentiary hearing in this matter that it did not intend to use the "stun gun" or the receipt from the vehicle.  Accordingly, the only evidence intended for use at trial consists of the articles or printouts concerning the Valium and Ambien that were recovered in the passenger back seat of the Jeep.

As detailed above, the hearing testimony showed that officers of the HPD responded to a "911" domestic violence call at the defendant's residence.  By the time the officers arrived, the defendant had departed the premises.  While they were there, however, he returned.  He parked his vehicle in front of the residence of a neighbor in the street.  After officers talked with the defendant, he was arrested and taken to the HPD building on the domestic violence charge.  The officers began inventorying the vehicle at the scene until money was located inside the Jeep.  At that time, the vehicle was taken to the sally port at the HPD where the inventory was completed later by evidence technician Tant.  The Jeep was subsequently searched again at the storage lot.[13]

The evidence shows that although the defendant consented to the search of his vehicle so that the officers could see if he had a prescription bottle that matched the pills in his pocket, the vehicle also was inventoried pursuant to the HPD policy because the defendant was arrested on the charge of domestic violence.  The evidence further shows that the officers had probable cause to arrest the defendant on that charge under Alabama State law.  Accordingly, the inventory of the vehicle, including the continuation of the same at the HPD sally port, prior to it being secured

---

[13]The United States has represented to the court that it does not intend to offer into evidence any evidence from this "third" examination of the vehicle.

at the storage location, was reasonable.  Still further, the recovery of the Internet articles by Tant was reasonable as they were discovered during the inventory process.  At that juncture, Tant was aware that the defendant had been arrested on the domestic violence charge involving the child and that drugs might be involved.  (H. Tr. at 310-11).

Accordingly, the motions to suppress and exclude any evidence from his vehicle (doc. 22 & 58) are due to be denied as to the evidence the United States intends to use at trial.  The only remaining issue concerning these items is their relevancy.  That will be addressed below.

**2.  Lake House Residence**

The United States informed the court during the evidentiary hearing that it only intends to introduce the bed linens, the Valium, the Alprezolam, and the "Homestyle Affairs"[14] magazine at trial.  Accordingly, the court need only address the reasonableness of the search of the lake house and the seizure of these items.

The defendant asserts that the seizure of these items exceed the scope of the warrant issued by the state court judge.  (Doc. 57).  The United States disagrees.  Neither party introduced any evidence at the hearing concerning the seizure of these items.  After the court inquired about the basis for the seizure of these items, it afforded the parties an opportunity to submit additional evidence.

The United States supplemented the record by informing the court that the "Homestyle Affairs" magazine that was located in the lake house was issued November 1994.  (Doc. 70 at 1). The prosecution also prepared a "Stipulation of the Parties" which states that Sergeant McDanal provided the information to Cullman County Sheriff's Deputy Matt Hogue that was used in the

---

[14]According to the supplement of the United States, the magazine is from November 1994.

affidavit in support of the search warrant for the defendant's lake house in Crane Hill, Cullman County, Alabama.  Additionally, the parties stipulated that McDanal was present for the execution of the warrant and that he "had seen the Polaroid images at issue in this case.  In these pictures, bed linens with a blue and white snowflake pattern are visible."  (Doc. 68 at 1-2).  During the search of the lake house, McDanal saw sheets in a closet that he believed were the same or similar to those in the Polaroid pictures.  Because of his awareness of their similarity, he seized the sheets as evidence.  *Id*. at 2.

Contrary to the defendant's assertions, the seizure of the relevant items, including the bed linens, the Valium, the Alprezolam, and the "Homestyle Affairs"[15] magazine, was reasonable.  The search warrant provided for the seizure of a "[s]tun gun, stethoscope, [p]ornographic photos, and pornographic videos" as evidence of violations of the domestic abuse statutes of the Code of Alabama.  (Doc. 57 at 3).  The warrant was supported by a detailed affidavit signed by Deputy Hogue that relayed much, if not more, of the information adduced at the evidentiary hearing in this matter.  *Id*. at 1.  In view of the fact that he and McDanal were present at the execution of the warrant at the residence, the seizure of the linens, pills, and magazine was reasonable.  Although not specifically listed in the warrant, they are reasonably recognized by the officers as evidence of criminal activity in view of the articulated allegations in the search warrant application.  Particularly, the application affidavit states that the victim's mother found "KY Jelly in a plastic syringe that had a small white pill enclosed in the syringe" and that "the pill was a Schedule 4 type sleep aid."  *Id*. at 1.  Still further, the affidavit states that the defendant was seen removing items from the Hoover residence where the domestic violence had occurred immediately before

---

[15]According to the supplement of the United States, the magazine is from November 1994.

he fled the home.

Accordingly, the motion in limine to suppress any evidence from the lake house (doc. 57) is due to be denied.

### 3.  8mm Videotape Cassette Evidence

In his next motion to suppress (doc. 25), the defendant seeks to suppress the use of the "original" 8mm videotape cassette.  Specifically, he asserts that the evidence is due to be suppressed because of purported "spoliation" of the evidence.  *Id*. at 1.  In support of this contention, the defendant states (and the United States does not dispute) that the original tape was mistakenly provided to the defense team, which allowed the defense expert to examine the same.  The defense expert concluded that the methodology used by Tant to locate any fingerprints would have left "traces of fingerprint dust even after the most minute and thorough cleaning possible."  *Id*. at ¶ 6.  The defense expert further stated that as a result of a "'frame-by-frame' analysis of the contents of the 8mm videotape," they "discovered 'artifacts' or 'glitches' on the video that . . . are 'magnetic interference' produced by the use of a magnet" and that these "'***artifacts' or 'glitches' do not appear in the VHS copy previously produced to the defense***."  *Id*. at ¶¶ 7-8 (italics and bold in original).  Premised on these facts, the defendant concludes that the 8mm videotape is "***clearly not in the same or substantially [the] same condition as it was at the time of the seizure***, and . . . thus inadmissible a the trial of this matter."  *Id*. at ¶ 9 (italics and bold in original).

The United States responds that the motion is due to be denied because the defendant's argument goes to the weight of the evidence rather than its admissibility.  (Doc. 48 at 6).  The United States continues, stating that it plans to present the testimony of Tant to explain the

circumstances underlying the defendant's motion.  *Id*.

The court heard arguments and evidence at the evidentiary hearing regarding this motion. It specifically heard the testimony of Tant concerning the chain of custody regarding the 8mm videotape, the mixup as to how the tape was erroneously transferred to the custody of the defense team, and how the fingerprint was "lifted" from the tape.

Upon consideration of the foregoing, the undersigned finds that the evidence and testimony is sufficient to authenticate the same.  The defendant's challenges are more appropriately addressed during cross-examination during the trial.  The motion (doc. 25) therefore should be denied.

### 4.  Still Photograph Fingerprint Evidence

In his next motion to suppress (doc. 26), the defendant seeks to suppress the use of the "digital still photographic image" of the defendant's fingerprint that was created on film from the photography depicted on the 8mm videotape.  *Id*. at 1.  He asserts that the evidence is due to be suppressed because the procedures used in obtaining the fingerprint analysis do not meet the standards for admissibility for scientific evidence.  *Id*.  Specifically, the defendant argues that the digital still image captured in this case from the 8mm tape does not have the requisite resolution for admissibility because the video itself (8mm) "automatically 'compresses' an image, creating even less resolution, and VHS and 8mm video cameras have the worst signal-to-noise ratio of any video formats . . . all of which leads to a poor quality original image."  *Id*. at ¶ 2.b. (footnote omitted).  Next, the defendant asserts that the RCA recorder used by the HPD to identify the thumb print still lacks the resolution quality "accepted by the FBI for digital images."  *Id*. at ¶ 2.c.  Still further, counsel asserts that the use of "such a low-resolution image" cannot pass the

*Daubert*[16] test.  Lastly, the defendant asserts that the United States "cannot meet the standards [sic] for admissibility of the 'still photograph" because it cannot prove the *integrity, chain of custody, and documentation of enhancements* of the 'still photograph' . . . ."  *Id.* at ¶ 3.

The United States responds that the motion is due to be denied because the defendant's arguments go to the weight of the evidence rather than admissibility.  (Doc. 48 at 6).  It also states that it intends to present the testimony of Tant to explain the circumstances referenced in the defendant's motion.  *Id.*

The court does not find the defendant's challenges to the thumb print evidence to be sufficient to preclude its use at trial.  In rejecting the defendant's assertions, the court makes the following observations and conclusions.

First, the court sees the process used to reproduce the 8mm thumb print evidence into a photograph as being akin to using a copy machine to reproduce, copy, enlarge, or reduce a document.  The primary issue is a matter of authenticity, that is, whether the evidence is what the proponent claims it is.  FED. R. EVID. 901(a).

Second, the defendant has not produced any evidence that seriously questions the authenticity of the resulting photograph that was used for comparison with the defendant's known prints.  To the contrary, the court is satisfied that the procedures that were used are sufficient to protect the integrity of the evidence.

Third, to the extent that *Daubert* is implicated in this instance,[17] nothing therein precludes

---

[16]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[17]Generally, *Daubert* is implicated in the context of expert witnesses, not with regard to authentication issues.  In the usual context, *Daubert* requires expert scientific evidence to be both reliable and relevant pursuant to FEDERAL RULE OF EVIDENCE 702.  *United States v. Henderson*, 409 F.3d 1293 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589).  In *Henderson*, the court stated that

the use of this evidence at trial.  Again, to the contrary, the testimony at the evidentiary hearing from the various witnesses demonstrates the relevance and the reliability of the evidence.  The defendant has offered nothing to alter the court's view of this evidence.

Fourth, to the extent the defendant seeks to challenge this evidence, those challenges go to the weight of the evidence, not the admissibility.  Much of the defendant's inquiry during the evidentiary hearing would be appropriate for cross-examination of the respective witnesses.

Fifth, to the extent that the defendant argues that the SWGIT (Scientific Working Group on Imaging Technology) Guidelines[18] have not been satisfied, warranting exclusion of the evidence, the court disagrees.  These Guidelines are recommendations.  (Def. Ex. 1 at Section 3; Testimony of FBI Evidence Tech. Lorenza Moore).  Additionally, nothing at the hearing demonstrates that the methods employed by the witnesses were not reliable.

In view of the foregoing, the motion (doc. 26) is due to be denied.

---

the evidence must: (1) constitute scientific knowledge; and (2) assist the trier of fact to understand the evidence or to determine a fact at issue.  *Id.* at 589-91, 113 S. Ct. 2786.  The scientific knowledge question requires the trial court to consider the theory or technique upon which the testimony is based in light of at least five factors:

(1) whether the theory or technique can be and has been tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) the known or potential rate of error for that theory or technique;

(4) the existence and maintenance of standards controlling the theory or technique's operation; and

(5) whether the theory or technique has attained general acceptance within the relevant scientific community.

*Id.* at 593-94, 113 S. Ct. 2786; *Gilliard*, 133 F.3d at 812.  In determining whether the evidence appropriately assists the trier of fact, the *Daubert* Court underlined the enhanced importance and role FED. R. EVID. 403 plays in excluding overly prejudicial evidence, because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."  *Daubert*, 509 U.S. at 595, 113 S. Ct. 2786 (quoting Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991)).

*Henderson*, 409 F.3d at 1302.

[18]The SWGIT Guidelines are located at Defense Exhibit No. 1 from the evidentiary hearing.

13

## B.  Motion for a *Daubert* Hearing

The defendant has filed a general motion for a *Daubert* hearing.  (Doc. 27).  At the evidentiary hearing on the various motions, defense counsel again made general challenges to various witnesses pursuant to the dictates of *Daubert*.  Having heard extensive testimony at the hearing, the undersigned finds that the anticipated witnesses produced by the United States are qualified to offer the testimony adduced during the evidentiary hearing at trial.

Particularly, with regard to the defendant's challenges to Carol Walker,[19] the court is not impressed with the defendant's *Daubert* challenge to her testimony.  Her resume and testimony clearly demonstrates her qualifications including thirty years experience in the Birmingham Police Department Identification Bureau.  She spent twenty years as a fingerprint technician, two years as a latent print examiner, and six years as a senior latent print examiner supervisor.  (Doc. 69-2 at 1).  She also is certified by the State of Alabama as a fingerprint examination instructor at the Police Academy.  She has conducted numerous latent fingerprint examinations and has testified in court as a fingerprint examination expert.  Additionally, nothing adduced at the evidentiary hearing demonstrated that her methodology or examination of the evidence was unreliable.

With regard to the defendant's challenges to the other witnesses that were in the chain of custody concerning the 8mm tape, the VHS taping process, and the production of the still photographs that were used to conduct the fingerprint analysis, there is nothing warranting exclusion of their testimony.  As already discussed, for the most part, the witnesses are not

---

[19]Walker is the only witness that the United States has identified as an expert pursuant to FED. R. CRIM. P. 16.  (See Doc. 69).

14

experts and therefore do not fall within the general parameters for *Daubert* consideration.

To the extent the defendant seeks a *Daubert* hearing, the same has been conducted.  To the extent that the defendant's motion seeks exclusion of the testimony of the witnesses of the United States under *Daubert* due to the lack of relevance, purported unreliability, or a lack of qualifications, the motion is due to be denied.[20]

### C.  Motions Dealing With the Victim and Sharon Culver

Numerous motions deal with the victim (K.W.) and Sharon Culver.  The first concerns whether the medical records of the victim during the relevant period should be disclosed to defense counsel in that it is anticipated that they fail to show any corroborating evidence that she was the child that was sexually exploited as depicted in the videos and photographs.  (Doc. 10). The United States understandably opposes disclosure of the records to the defendant.  However, it does not oppose an in camera review of the same by the court for any favorable or exculpatory information.  Accordingly, at least ten days before trial, the records are to be provided to the undersigned for in camera review of the same.

The next motion concerns whether the victim and her mother should be compelled to undergo additional physical examinations and photographing.  (Doc. 12).  The motion is opposed by the United States.  (Doc. 48).

The defendant argues that the genital area depicted in the 8mm tape and the still images contain "minute physical characteristics that the defense believes can be identified to specific individuals if proper comparative images are provided."  (Doc. 12 at 2).  He goes on to say that

---

[20]The court does not see, and the United States has not offered, witnesses McDanal and Tant as experts.  They were law enforcement officers involved in the collection, retention, storage, and handling of the physical evidence.

the "still images that the State obtained by conducting 'gynecological exams of . . . and . . . some time after the alleged incident are inadequate for forensic comparison purposes for several reasons that can be explained to this . . . court." *Id*.  Still further, he states that the available photographs are inadequate in that essential areas of the bodies in the present photographs do not depict the essential surfaces. *Id*. at 3.  Lastly, he argues that the additional photographs would be "***both less graphic and less invasive than the examinations previously conducted by the State***." *Id*. (emphasis in original).

The United States counters that physical examinations and photographing has been done once before and the defendant has a copy of those photographs.  (Doc. 45 at 5).  Additionally, the United States argues that further photographing would be cumulative and unnecessary. *Id*.  Finally, it asserts that "the conduct alleged in the Indictment occurred approximately four years ago.  Any findings of a new physical exam would be irrelevant and far too attenuated to be of any probative value regarding the charged conduct." *Id*.

After reviewing the written and oral arguments of counsel and after examining the relevant photographs and video, the court is convinced that additional examinations and photographing are not necessary to ensure the defendant's due process and fair trial rights.  Although the clarity of the original photography could be better, that does not justify further examinations and photographs.  This is particularly true due to the passage of over four years since the taking of the initial photographs.  The present exhibits are sufficient for the defendant to present his arguments and defense to the jury in this matter.  Accordingly, the court finds that the motion is due to be denied.  (Doc. 12).

16

**D.  Motions to Dismiss**

The defendant asserts in his next motions that the case should be dismissed because of a lack of venue (doc. 28 & 54) and because the various counts are multiplicious (doc. 40 & 55).  In the first motion, dealing with venue, the defendant asserts that "the Government cannot prove '**venue**' within the Northern District of Alabama by any '**objective**' evidence, and only seeks to establish venue by the unsupported assertions of the alleged victim K.W. or her mother (who have filed lawsuits for millions of dollars against this defendant), who assert that the 8mm videotape and/or Polaroid photographs at issue in this case depict a particular 'comforter' or 'quilt' bearing a 'snowman pattern.'"  (Doc. 54 at ¶ 1 (bold in original)).

First, the court notes that the initial motion (doc. 28) is moot due to the filing of the superseding indictment.  Accordingly, the undersigned will enter a separate order disposing of that motion.  Next, the undersigned further finds that the second motion to dismiss based on venue grounds (doc. 54) is best addressed at the close of the prosecution's case.  However, the undersigned further notes that the testimony of the victim alone may be sufficient to establish venue in this matter.

 Concerning multiplicity (doc. 40 & 55), the defendant argues that charging the defendant with separate counts of "production of pornographic materials' when the materials are a 'videotape' and five (5) 'still photographs' which are clearly depictions from the same location, at the same time, and the same person(s)[ ], violates the rule against multiplicity."  (Doc. 55 at ¶ 2).  He further argues that the various offenses are "'in law and in fact, the same offense.'"  *Id*. at ¶ 4 (citing *United States v. Linetsky*, 533 F.2d 192, 197 (5th Cir. 1976)).  The United States counters that it is the production of each depiction that is the offense.  (Doc. 63 at 2-4).

First, the court notes that the initial motion to dismiss (doc. 40) is moot due to the superseding indictment.  Accordingly, the court will enter a separate order disposing of the same. Second, with regard to the multiplicity argument in the next motion (doc. 55), the undersigned agrees with the United States that there is no due process or double jeopardy violation in this instance.

The prosecution correctly frames the issue as being "whether the production of the pornographic video tape and the production of the pornographic Polaroid photographs are properly charged as six different counts."  (Doc. 63 at 2).  In support of its contention that the answer is yes, the United States relies on the holding in *United States v. Esch*, 832 F.2d 531 (10th Cir. 1987), *cert. denied*, 485 U.S. 908 (1988).

In *Esch*, the defendants were charged with sixteen counts of sexual exploitation of children by photographing their children and themselves engaged in sexually explicit conduct. The photographs were then sold.  18 U.S.C. § 2251(a) prohibits the use of a minor to engage in "any sexually explicit conduct for the purpose of producing any visual depiction of such conduct."  Construing the statute, the Tenth Circuit Court of Appeals held that each use of a minor to create a visual depiction constituted a separate and distinct violation.  *Esch*, 832 F.2d at 541.  The court stated that the inquiry as to what constituted the correct unit of prosecution focused in part on the identification of the key element of the offense.  The court then concluded the key element of the offense was the use of a minor to engage in sexually explicit conduct for the purpose of creating a visual depiction of such conduct.  *Esch*, at 541-42.  The fact that multiple photographs were sequentially produced during a single session was deemed irrelevant because each photograph depended upon a separate and distinct use of the children.  *Id*. at 542.

18

Finally, the court held that the indictment properly charged separate counts for each of the photographs produced.  *Id*.

Adopting the reasoning of the court in *Esch*, the undersigned finds that the motion to dismiss the multiplicious counts (doc. 55) is due to be denied.  Each depiction of a child is a different offense.  The distinctiveness of each offense is depicted in the different mediums used (video and Polaroids) and the varying positions and items that were photographed.  Accordingly, the court so finds.

### E.  Motions in Limine

### 1.  Domestic Violence 911 Call

The defendant next asserts in his first motion in limine that any reference to the police responding to a "domestic violence" call would be unduly prejudicial.  (Doc. 14).  Specifically, he notes that he was acquitted in the State court proceedings concerning any wrong doing on the night that the police were called.  He further states that he anticipates that the prosecution may adduce testimony suggesting that the call was originally a "husband vs. wife domestic violence call," which is not probative.  *Id*. at 2.  The United States opposes this motion, responding that the November 12, 2003, call "is inextricably intertwined to the facts giving rise to the Indictment."  (Doc. 48 at 1).  The prosecution further states that the evidence of the call will "put into context for the jury why the police arrived at the defendant's residence on November 12, 2003.  Without reference to this call, it may appear to the jury that the police randomly appeared at the house which would not make sense.  This evidence is admissible, because it is a piece of the puzzle that will provide a whole and complete picture to the jury."  *Id*. at 2.

The court finds that the witnesses should be allowed to testify to the fact that they were

responding to a 911 call.  The particulars of the call, whether a husband and wife disturbance or whether a child and parent issue, are not relevant and, to the extent relevant, are unduly prejudicial under FEDERAL RULE OF EVIDENCE 403.[21]  Accordingly, the motion in limine is due to be granted in part and denied in part.

### 2. Evidence That the "Video Subject" or Others Were Drugged

In the next motion in limine (doc. 15), the defendant seeks to exclude any evidence that the female subject or subjects in the video or the Polaroid photographs "were drugged, stunned, knocked out, and/or under the influence of any type of drugs, prescription medications, o[r] any other substances which rendered them incapable of resistance or otherwise incapacitated in any manner."  *Id*. at 1.  In support of this contention, the defendant argues that "there is absolutely no chemical, substantive, or testimonial evidence to support any such allegation, and to allow such a claim to be brought before the jury in this case either by way of witness testimony or argument by the prosecution."  *Id*. at 2.  Further, he states that no chemical evidence supports this contention and he has not been charged with any offense of providing drugs to any alleged victim.  *Id*.  Finally, he states that Sharon Culver "has previously attempted and will again attempt to introduce claims or testimony alleging that" the defendant has drugged her and her children.  *Id*.

The United States responds that the motion is premature.  It goes on to state, "If the Government can establish at trial through the testimony and evidence that K.W. was incapacitated in some way, then the Government should be allowed to develop its case as

---

[21]In so finding, the court does not suggest that the details of what Sharon Culver and K.W. experienced and observed may not be Rule 404(b) evidence.  For instance, if the competent evidence demonstrates that the defendant was found or seen in the bed with K.W. and that a syringe, pill, and Polaroid camera were present, it may be probative evidence that would be relevant to demonstrate intent, identity, or some other Rule 404(b) act.  *See* FED. R. EVID. 404(b).  That will remain a matter to be decided by the trial judge at the appropriate time.  The court does note, however, that the prosecution has not given notice to the defendant or the court that this evidence constitutes such evidence.

supported by the evidence. . . ."  (Doc. 48 at 2).  It also notes that the defendant "would, of

course, be allowed to object and cross-examine witnesses as he sees fit."  *Id*.

   Upon consideration, the court finds that the motion is due to be denied in part and granted

in part in that should competent evidence show that the defendant "drugged" the victim as a part

of his purported criminal activity, it is relevant.  However, to the extent competent evidence

could be adduced showing that the defendant "drugged" Sharon Culver and her son, the court

would have to evaluate that evidence immediately prior to it being offered at trial.  To the extent

the competent evidence would show that on November 12, 2003, that the defendant was

attempting to "drug" the victim to foster or advance criminal activity in violation of § 2251(a), as

already noted, it may constitute Rule 404(b) evidence.[22]  Accordingly, this motion is due to be

granted in part and denied in part.

### 3.  Mention of Any and All Drug or Prescription Medications

   In the next motion in limine, the defendant seeks to exclude mention at the trial of any

prescription medications or drugs allegedly secured by the defendant from Internet or other

sources.  (Doc. 16).  Specifically, the defendant argues that the United States will "attempt to

argue that Brian Culver has previously secured a substance commonly known as 'Valium,' and

reported by chemists as diazepam, and/or other prescriptions or controlled substances, from

various internet sources and other sources, and that the alleged victim, . . . K.W., reportedly was

rendered unconscious during the time of the taking of the photographs and/or video recording in

these cases.  These are conclusions of the Government or its witnesses, and not supported by any

---

[22]The undersigned again notes that the prosecution has not given the defendant notice that such evidence may be considered Rule 404(b) evidence as is required.

21

test results." *Id*. at 2.  He also argues that the evidence is not charged in the indictment and not probative of the present charges.  *Id*.

The United States responds that "it does intend to offer evidence that controlled substances such as Alprezolam (also known as Panax), Diazepam (also known as Valium), Zolpidem (also known as Ambien and Stilnox), and Viagara were found in the defendant's residences in Hoover and Cullman, Alabama.  The Government also intends to offer evidence of articles related to Valium and Ambien that were found in the defendant's vehicle."  (Doc. 48-2). The United States further states that it expects to present evidence that the victim was given Zanax and Valium by the defendant and that Ambien was found in a vaginal syringe during the November 12, 2003, search in Hoover.  *Id*. at 3.  Lastly, the United States requests that the court reserve its ruling until trial to prevent a "mini-trial" at this juncture.

Should the United States be able to offer competent evidence that the victim was "drugged" using Valium or Ambien at the time of the making of the video or the photographs, it would be relevant under FED. R. EVID. 401.  However, the relevancy of the evidence from the November 12, 2003, Hoover search will depend upon the competent evidence that the United States will be able to adduce at the trial of this matter.  To ensure the requisite evidentiary foundation is laid before such testimony or argument is allowed, the United States is precluded from referencing such to the jury before an out-of-the-presence of the jury hearing is conducted. Accordingly, this motion is carried until trial of this matter with the above limitation.

### 4.  Drugging Evidence Concerning Sharon Culver and Her Son

The defendant next seeks to preclude any evidence that the defendant "drugged" her or her son.  (Doc. 17).  It further seeks an instruction from the court that Sharon Culver "avoid

22

non-responsive and immaterial answers to questions asked during the course of trial." *Id*. at 1.

The United States responds that it does not intend to offer any evidence that Culver or her son

were ever drugged by the defendant.  Accordingly, that portion of the motion is moot.  To the

extent the defendant seeks a pretrial order or admonition to witness Culver that she refrain from

improper responses, the undersigned believes the matter is premature.  It is anticipated that the

prosecutors will meet with the witness and explain the expectations for a witness in court.  If

needed, and upon request, the court should entertain appropriate objections to inappropriate

responses and requests for instructions from the court to the jury.  Thus, the motion is due to be

denied in part and granted in part (affirming the representations of the prosecution).

### 5.  Adult Materials

The defendant next seeks to exclude any reference before the jury to sexually explicit

adult videotapes and/or magazines found in the defendant's residence.  (Doc. 18).  The United

States has replied that it does not intend to offer any of the adult materials that were seized

during the searches.  (Doc. 48 at 3).  Accordingly, the court finds that, in view of the

representation of the prosecutor, this motion is moot.

### 6.  Police Interviews

The defendant next seeks to exclude any reference before the jury to the content of the

police interviews of Culver and the victim.  (Doc. 19).  The United States has replied that it does

not intend to offer any of the interviews during its case-in-chief.  It does, however, reserve the

right to offer the same to the extent they become relevant as prior consistent statements after

cross-examination.  (Doc. 48 at 4).  Accordingly, the court finds that, in view of the

representation of the prosecutor, this motion is moot and the matters are left for further

discussion and argument should the interviews become relevant following the cross-examination of a particular witness.

### 7.   Use of A Stun Gun

The defendant next seeks to exclude any reference before the jury to his allegedly using a "stun gun" on the alleged victim and any evidence that he provided the victim with prescription drugs.  (Doc. 20).  Specifically, he asserts that he has not been charged with any claim alleging that he used a "stun gun" on any victim or that he provided any drugs to the victim.  *Id*. at 1.  He further states that he was found not guilty on the previous state charges related to such allegations.  *Id*. at 2.  The United States responds that it "expects K.W. to testify that she was awakened by a shocking sensation on the back of her neck during the late night/early morning hours of November 11-12, 2003, and at this time Brian Culver was in the bed with her.  Earlier on November 11, 2003, K.W. is expected to testify that Culver gave her two pills for a headache. K.W. took one and threw the other one away.  Blood tests show that K.W. had the presence of the controlled substance diazepam in her blood."  (Doc. 48 at 4).  The United States argues that this evidence is relevant due to the fact that "on the occasions when the pornography was produced [the defendant] had given K.W. controlled substances causing her to be unconscious and have no recollection of the abuse.  The Government has a right to prove its case as supported by the evidence."  *Id*.

Assuming for the sake of this motion that the United States is able to show that the defendant gave the victim controlled substances at the time the illegal materials were produced, the evidence concerning the events on November 11, 2003, may have probative value, particularly under Rule 404(b).  This additionally is contingent on the quantum and quality of the

24

evidence presented concerning the events on the night of November 11, 2003.[23]  Therefore, to

ensure the requisite evidentiary foundation is laid before such testimony or argument is allowed,

the United States is precluded from referencing such to the jury before an out of the presence of

the jury hearing is conducted.  Accordingly, this motion is carried until trial of this matter with

the above limitation.

### 8.  "Relative Position(s) Evidence"

In the next motion in limine, the defendant seeks an order prohibiting the use of evidence

and argument by the United States concerning the "'relative position(s)' of the body of the

alleged victim" to show that she was "drugged."  (Doc. 21).  The United States responds that

"Defense counsel has clarified this motion in conversations with the undersigned [A.U.S.A.] and

his intent is to prevent the Government from offering testimony by an expert as to the way the

defendant was positioned when he allegedly used a stun gun to shock K.W. on November 12,

2003.  The Government does not intend to offer such testimony."  (Doc. 48 at 5).

Following a hearing on the relevant motions, the undersigned is not certain that the

interpretation of the United States are necessarily correct.  However, to the extent the motion

deals with the stun gun, it is moot based on the representation of the prosecutor.  To the extent

the motion also deals with testimony that the positions (or lack of movement) indicates that the

victim was drugged, the undersigned finds that such testimony would be inadmissible absent a

---

[23]Neither party made a persuasive proffer of what the evidence would be concerning the events of that night.  For instance, the United States never demonstrated through first hand evidence what the facts were.  By way of example, there is a dispute as to whether a Polaroid camera was found in K.W.'s bedroom.  Additionally, it is not clear to the undersigned where the vaginal syringe and pills were located and by whom they were recovered.  These matters give the court little confidence when attempting to resolve difficult evidentiary issues such as this.

proper foundation.[24]  To the extent that the United States might assert that it is a reasonable inference from the lack of movement, the undersigned believes that should be left for decision at trial when the evidence can be better evaluated and before closing argument to the jury. Accordingly, this motion is due to be granted in part, denied in part, and carried to trial in part.

### 9.  Seizure of Articles Regarding Valium and Ambien

As previously noted, the court finds that the seizure of the articles concerning Valium and Ambien were reasonable under the Fourth Amendment.  Therefore, the next issue concerns their relevance under FEDERAL RULE OF EVIDENCE 401.  As a part of his motion in limine concerning the seizure of the evidence from his Jeep, the defendant argued at the hearing on the motion that the articles are not relevant in the present prosecution.  (Doc. 22).  The United States obviously disagrees.

It is evident to the undersigned that this evidence is relevant provided there is some competent evidence that the defendant used some controlled substance to incapacitate the victim when the photographs and video were made.  It shows his planning, preparation, and participation in criminal activity.  Accordingly, this motion is due to be denied absent a failure of proof on the underlying precept.

### 10.  8mm Videotape Fingerprint Evidence

In the next motion in limine, the defendant seeks an order prohibiting the use of evidence and argument by the United States concerning the "existence of an alleged latent fingerprint of Defendant on an 8mm videocassette, due to the State of Alabama's '**Spoliation**' of said

---

[24]For instance, an appropriate medical doctor might be able to reach such a conclusion.  However, there is no indication in this case that such testimony will be offered.  To the contrary, as best the undersigned can tell there have been no expert reports provided to the defense supporting such testimony as would be required by FEDERAL RULE OF CRIMINAL PROCEDURE 16.

evidence." (Doc. 24).  In support of the motion, the defendant states that Evidence Technician

Tant informed the defendant's fingerprint expert that "*the process of 'lifting' the fingerprint from*

*the videotape also 'cleaned' and/or 'obliterated' all traces of fingerprint powder and processing*

*of the 8mm videotape*." (*Id*. at ¶ 8 (italics in original)).  He also argues that because of this

activity by Tant, "*neither the Defendant nor his experts are able to (1) independently verify that*

*the 8mm videotape is in fact the 'original,' and (2) verify that the 'lifted fingerprint' was ever*

*actually located on the 8mm videotape, and (3) conduct appropriate independent examination*

*and analysis of the fingerprint allegedly lifted from said 8mm videotape*."  *Id*. (italics in original).

The United States responds that the motion is due to be denied because the defendant's

argument goes to the weight of the evidence rather than its admissibility.  (Doc. 48 at 6).  The

prosecution further states that it will offer the testimony of Tant to explain the circumstances

referenced in the defendant's motion concerning the mixup of how counsel for the defendant and

his expert ended up with the original tape.  *Id*.

This motion was discussed at the evidentiary hearings in this case.  Tant did testify and

explain how the original tape was provided by accident to the defense team.  He also explained

the absence of fingerprint powder on the tape.  The undersigned is satisfied that these matters go

more to the weight of the evidence than to its admissibility.  The court further is convinced that

the United States will be able to adequately authenticate the tape and the fingerprint evidence that

was taken from it.  This is not a spoliation issue, but a matter of weight.

### 11.  Prior State Court Convictions

The defendant next seeks an order precluding the United States from offering any

evidence of his related state court convictions.  (Doc. 36).  The United States responds that it

does not intend to offer any evidence of the prior convictions in its case-in-chief.  It does, however, reserve its right to adduce the same if appropriate on cross-examination.  (Doc. 48 at 9).  In view of the representations of the United States, the motion is moot.  Before any reference is made to said convictions, the matter must again be presented to the trial judge for a ruling.

### 12.  Polaroid and 8mm Cameras

The defendant next seeks an order precluding any evidence concerning the Polaroid and 8mm cameras that were recovered from his Hoover residence.  (Doc. 56).  He asserts that such an exclusion is appropriate because the cameras have not been "linked to or shown to be the camera(s) that produced the subject photographs and/or video, and no such cameras were seized from the physical possession or vehicle of this Defendant."  *Id*. at ¶ 1.  Counsel continues and argues that this evidence is not relevant because the United States cannot prove that the 8mm videotape and the Polaroid photographs charged in the various counts were produced using these cameras.  *Id*. at ¶ 2.

The United States responds that this evidence is relevant because it tends to show that the defendant had the means to produce child pornography as charged.  (Doc. 64 at 3).  In support of this argument, the prosecution relies upon the recent Eleventh Circuit Court of Appeals decision in *United States v. Ndiave*, 434 F.3d 1270 (11th Cir. 2006).  In discussing the admissibility of evidence, the court in *Ndiave* stated, "When proffered evidence is of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility." *Ndiave*, 434 F.3d at 1281 (citing *United States v. Todd*, 108 F.3d 1329, 1332 (11th Cir. 1997) (internal quotations omitted)).

Considering the circumstantial value of this evidence, the court agrees with the

prosecution that the evidence is relevant.  It tends to show that the defendant possessed the

necessary equipment to produce the images charged in the indictment.  It is noteworthy from a

circumstantial evidence standpoint that the search of the residence revealed both types of

cameras that were used to make the charged images.  The defendant's argument that the cameras

were not found in the Jeep or on the presence of the defendant go to the weight the jury should

give to the evidence and the reasonable inferences they may draw from the same.  It certainly

does not warrant exclusion of the evidence.  To the extent that the defendant argues that the

evidence has not been linked to the defendant, the court again finds that to be a matter of

argument not admissibility.  If the evidence establishes nothing more than that the cameras were

found in the defendant's residence, it is still circumstantial evidence the jury may consider after

hearing the respective arguments of counsel.

### 13.  "Male Genitalia" Photograph

In the next motion in limine, the defendant seeks to exclude evidence that one of the

Polaroid photographs that was recovered at the residence depicting "male genitalia" contained

the defendant's fingerprint.  (Doc. 59).  In support of this motion, the defendant argues that the

photograph is not relevant to any element of the prosecution's case and that its admission would

be "substantially more prejudicial than probative" under Rule 403.  *Id.* at ¶ 2.  The United States

responds that this evidence is highly relevant to the charges in the indictment.  (Doc. 64 at 5).

The "male genitalia" photograph that is at dispute was recovered at the defendant's

residence in an envelope with the photographs depicting the minor as is charged in Counts Two

through Six of the indictment.  (Gov. Ex. 9).  Due to its location in the residence in the same

envelope as the other photographs, the court finds that this evidence is relevant and highly

probative to show that the defendant had custody, control, and possession of the photographs. Although custody, control, or possession at the moment of the search was not an element of the offense, it is circumstantial evidence, along with the other evidence (including possession of 8mm and Polaroid cameras) that the defendant "did employ, use, persuade, induce and entice a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct." (Doc. 49 (superseding indictment)).  *See* FED. R. EVID. 401.  Additionally, any slight prejudicial impact due to the nature of the photograph is outweighed by the highly probative value of the same.  *See* FED. R. EVID. 403.  The defendant's motion, therefore, is due to be denied.

### 14.  Evidence that the Defendant Gave K.W. Drugs

The defendant next seeks to preclude any evidence from K.W. that the defendant gave her drugs on several occasions other than the times when the photographs were made.  (Doc. 60). The defendant asserts that this testimony would be irrelevant, not an element of the offenses, not part of the *res gestae* of the offenses, and substantially more prejudicial than probative.  *Id*. at ¶ 2.  The defendant further states that the victim "has provided formal statements and interviews wherein she has confirmed that she was totally unaware that any of the events depicted in the subject video and/or photographs had ever happened at all. . . ."  *Id*. at ¶ 3.  Finally, counsel states that "there is no scientific evidence or testimonial evidence to support said conclusions and only the position that the female is evidently still during the video is left to support these conclusions."  *Id*. at ¶ 4.

The United States responds that the motion is unsupported, premature, and an inappropriate topic for suppression.  (Doc. 64 at 6).  It further asserts that "[t]he testimony the

defendant seeks to suppress and exclude has not yet occurred.  Once it occurs, the defense will be free to cross-examine the witness."  *Id*.  According to the United States, that is the "appropriate time and place to raise these questions. . . ."  *Id*.

To the extent the defendant seeks a pretrial order or admonition to the witness that she refrain from improper responses, the undersigned believes the matter is premature.  It is anticipated that the prosecutors will meet with the witness and explain what is required of a testifying witness.  If needed, and upon request, the court should entertain appropriate objections to inappropriate responses from the witness and requests for instructions from the court to the jury.

With regard to the prosecution's objection to the timeliness of the motion in limine, the court finds that raising matters such as this are appropriate prior to trial.  Second, with regard to the merits, the court finds that if the competent evidence shows (1) that the victim is able to identify herself as the subject of the video or the photographs, (2) that she has no recollection of the incidents, and (3) the defendant provided her with drugs that led to her becoming sleepy, then the evidence does have probative value either as being the *res gestae* of the charged offenses or as Rule 404(b) evidence.  Accordingly, the undersigned finds that the motion is due to be denied provided the foregoing considerations are satisfied.

### 15.  Relevancy Motion

The defendant's last motion in limine addresses numerous items of evidence on relevance grounds.  (Doc. 66).  They were all addressed in detail during the evidentiary hearing or in the various pleadings.  To the extent that the defendant moves to exclude references to the "stun gun" and any receipts concerning the "stun gun" that were located in the Jeep, the motion is moot

31

as the United States does not intend to offer the same.  *Id*. at ¶¶ 1.a.- b.[25]  With regard to the articles or printouts concerning prescription medications, the motion is denied as provided herein.  *Id*. at ¶ 1.c.

To the extent the motion seeks exclusion of any evidence seized from the defendant including "a 'lip balm case' containing prescription medicines that are not related in any way to this case," the motion is due to be granted.  However, to the extent the drugs include sleep inducing agents, the motion is due to be denied for the reasons stated herein.  *Id*. at ¶ 2.

To the extent that the motion seeks exclusion of the "stun gun box" and prescription medications that were located in the house, the motion is due to be granted unless the United States connects the evidence to the present charges as discussed previously.[26]  *Id*. at ¶ 3.

With regard to the evidence seized at the lake house, that is, the bed linens, the Valium, the Alprezolam, and the "Homestyle Affairs" magazine, these items are relevant provided that the United States adequately connects the same to the present charges.  *Id*. at ¶ 4.[27]

Concerning the motion's reference to computer printouts or information related to prescription medications seized from the defendant's computer, there was no discussion at the hearing that the United States intended to use such at trial.  *Id*. at ¶ 5.a.  However, to the extent that this part of the motion could be read to include the printed articles found in the defendant's Jeep, for the reasons stated previously, the motion is due to be denied with regard to this evidence.  Similarly, with regard to any printout or other evidence purportedly seized on the

---

[25]For the convenience of all concerned, the court has cited the relevant paragraph of the motion for clarity.

[26]This is particularly true with regard to any Zanax or Ambien that was located at the residence.

[27]Although the defendant only lists the "prescription medications in his motion, the United States has not informed the court that such evidence from the lake house will be offered."  *Id*. at ¶ 4.a.

defendant's work computer at the lake house, there was no indication that the United States intended to use any such evidence. *Id*. at ¶ 6.a.

With regard to the testimony that the defendant attempted to give Panax, Valium, or any other drug to K.W. on or about November 11, 2003, the court has earlier addressed this matter. *Id*. at ¶ 7.  Accordingly, if the conditions previously specified are met, the motion is due to be denied.

With regard to the testimony concerning drugs being given to the victim and any other minor,[28] the court's prior findings apply.  *Id*. at ¶¶ 8 & 9.

With regard to the conviction for possession of obscene materials, the prosecution has represented that it will not reference the same during the trial.  *Id*. at ¶ 10.  The motion is moot.

With regard to any testimony concerning the domestic violence call and the "whereabouts where the 8mm videotape and Polaroid photographs were seized," the motion is due to be denied as discussed previously.  This information is relevant under FED. R. EVID. 401.  *Id*. at ¶¶ 11 & 12.

### F.  Motion for a Bill of Particulars

The defendant seeks additional, specific dates when the individual visual depictions were produced for each count of the indictment.  (Doc. 53).  The United States has responded that it cannot be more specific in that the minor victim was drugged and was unconscious during the commission of the crimes.  (Doc. 67).  This position is consistent with the testimony presented at the evidentiary hearing on the pending motions.  Accordingly, the motion is otherwise denied.

### IV.  CONCLUSION AND RECOMMENDATIONS

Premised on the evidence, the pleadings, and the arguments of counsel, the court makes

---

[28]Presumably, this is a reference to Culver's son.

the foregoing findings and recommendations.

Either party may file specific written objections to this report and recommendation by **May 28, 2007**. *See* 28 U.S.C. § 636(b). Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation shall bar an aggrieved party from attacking the factual findings on appeal.

The Clerk is **DIRECTED** to serve a copy of this report and recommendation upon the counsel for the United States and upon counsel for the defendant.

**DONE**, this the 14th day of May, 2007.

*John E. Ott*

JOHN E. OTT
United States Magistrate Judge